**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
CHRIS LEVAKOS,

                              Plaintiff,

              -against-


JO ANNE B. BARNHART,
Commissioner of Social Security,


                              Defendant.
-------------------------------------------------------X

<u>**MEMORANDUM OF**</u>
<u>**DECISION AND ORDER**</u>
05 CV 2172 (ADS)


<u>**APPEARANCES:**</u>

**CHRIS LEVAKOS**
Plaintiff <u>Pro Se</u>
39 Brookvale Avenue
West Babylon, New York 11704

**ROSLYNN R. MAUSKOPF**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
Attorney for the Defendant
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201
              By:     John M. Kelly, Special Assistant United States Attorney


**SPATT, District J.**

              Chris Levakos (the "plaintiff") commenced this action pursuant to the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of

the Commissioner of Social Security (the "Commissioner" or the "defendant") that

found him disabled as of May 25, 1994, but not prior to that date.  Presently before the

Court are motions by both parties pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for judgment on the pleadings.

# I. BACKGROUND

## A. Procedural History

### 1. The Plaintiff's Applications for Disability and Supplemental Security Income Benefits

On May 4, 1979, the plaintiff filed an application for social security disability benefits. The plaintiff alleged that he was disabled and unable to work since December 20, 1976 due to an upper back problem. On September 10, 1979, the plaintiff's application was denied. Tr. 98-102. The plaintiff did not appeal. Tr. 20.

On March 12, 1984, the plaintiff filed an application for supplemental security income benefits alleging a back impairment. On April 27, 1984, the plaintiff's application was denied because the plaintiff was found not to be disabled. Tr. 122-35.

On November 8, 1994, the plaintiff filed a second application for disability insurance benefits. The plaintiff asserted that he was disabled and has been unable to work since January 1, 1976. Tr. 18-19. This disability onset date is approximately twelve months earlier than the plaintiff alleged in his initial application for benefits on May 4, 1979. On January 30, 1995, the plaintiff's second application for disability insurance benefits was denied. Tr. 31. On March 2, 1995, the plaintiff requested that the denial of his second application for disability insurance benefits be reconsidered.

Tr. 34.  Reconsideration was granted and, upon review, the Social Security

Administration upheld the denial of the plaintiff's claim.  Tr. 35.

On May 22, 1995, the plaintiff requested that his November 8, 1994 claim be

heard by an Administrative Law Judge ("ALJ").  Tr. 38.  A hearing was held on

December 4, 1995, at which the plaintiff appeared with counsel and testified before

ALJ Richard Karpe.  Tr. 91.

On January 26, 1996, ALJ Karpe issued a written determination finding that

the plaintiff was not disabled on or before December 31, 1980, the date he last met the

qualifications for disability insurance benefits under the Social Security Act.  Tr. 91-

93.  Thus, the plaintiff's claim for benefits was denied.  On February 23, 1996, the

plaintiff appealed.  Tr. 94.  On November 12, 1996, the Appeals Council denied the

plaintiff's request for review and determined ALJ Karp's determination to be final.

Tr. 96.  The plaintiff did not appeal.

### 2. <u>Stieberger v. Sullivan</u>, 792 F. Supp. 1376 (S.D.N.Y. 1992)

On June 22, 1992, a District Court in the Southern District of New York

approved a settlement in the class action case of <u>Stieberger v. Sullivan</u>, 792 F. Supp.

1376, <u>modified</u>, 801 F. Supp. 1079 (S.D.N.Y. 1992).  "The settlement agreement

required the Commissioner to provide a New York statewide class with notice and

opportunity to request the reopening of, and new decision on, disability claims that

were denied or terminated at any administrative level between October 1, 1981 and

October 17, 1985, and were decided at the administrative law judge or Appeals

Council level between October 7, 1981 and July 2, 1992." Shaw v. Chater, 221 F.3d

126, 136 (2d Cir. 2000); Stieberger, 801 F. Supp. at 1086. The plaintiff was a member

of this class by virtue of his denied claim for supplemental security income benefits

that he filed on March 12, 1984.

### 3. Review of the Plaintiff's Claims under the Decision in Stieberger

On March 8, 2001, the plaintiff was notified that the Social Security

Administration reviewed his prior applications pursuant to Stieberger. Apparently, the

Social Security Administration re-opened not only the plaintiff's 1984 claim for

supplemental security income benefits, but also the plaintiff's May 4, 1979 claim for

disability benefits. The May 4, 1979 claim was denied on September 10, 1979. Thus,

the Court believes that disability benefits claim should not have been re-opened,

because this claim was not "denied or terminated at any administrative level between

October 1, 1981 and October 17, 1985," nor was it "decided at the administrative law

judge or Appeals Council level between October 7, 1981 and July 2, 1992." See

Shaw, 221 F.3d at 136; Stieberger, 801 F. Supp. at 1086.

Upon review, the Administration adhered to its prior determination that the

plaintiff's disability insurance benefits should be denied. Tr. 118. However, the

Administration also found that, with regard to the plaintiff's supplemental security

income benefits, the plaintiff met the disability requirements as of November 20, 2000, but not earlier.  Tr. 137.

On or about March 22, 2001, the plaintiff filed a request for a hearing before an ALJ.  Tr. 140.  On September 5, 2001, a hearing was held before ALJ Jerry J. Bassett for the purpose of re-adjudicating the plaintiff's claims.  Tr. 246.  The plaintiff appeared at this hearing without a lawyer.  Tr. 246.  The purpose of the hearing was to review the Administration's determinations that, based on the plaintiff's application for disability insurance benefits filed on May 4, 1979, and his application for supplemental security income filed on March 12, 1984, the plaintiff was not disabled prior to November 20, 2000.  Tr. 246.

On October 26, 2001, ALJ Bassett issued a written determination of the plaintiff's appeal.  Tr. 246-252.   ALJ Bassett's decision was partially favorable to the plaintiff, finding the plaintiff disabled since May 25, 1994, but not before that date. Tr.  243-52.  Because the plaintiff last met the special insured status of the Act on December 31, 1980, his claim for disability insurance benefits would again be denied. However, the plaintiff was entitled to his claim for supplemental security income benefits filed on March 12, 1984.  Tr. 252.  The plaintiff appealed.

On October 24, 2003, the Appeals Council notified the plaintiff that it had granted review of the October 26, 2001 determination, vacated ALJ Bassett's decision, and remanded the matter for further development of the administrative

record and to issue a new determination regarding whether the plaintiff was disabled prior to November 20, 2000. Tr. 254-56. The Appeals Council affirmed the March 7, 2001 determination that the plaintiff was disabled since November 20, 2000.

On April 5, 2004, the plaintiff appeared at a hearing before ALJ Bassett for the purpose of adjudicating the matter on remand. The plaintiff appeared without an attorney. On June 25, 2004, ALJ Bassett issued a written determination that the plaintiff was disabled since May 25, 1994, but not before that date. Tr. 10-17. On February 28, 2005, the Appeals Council denied the plaintiff's request for review of its decision. Accordingly, ALJ Bassett's determination became a final decision of the Commissioner of Social Security. Tr. 3.

On May 4, 2005, the plaintiff, acting pro se, filed a complaint in this action. The plaintiff alleges that ALJ Bassett's determination that his disability onset date was May 25, 1994 was erroneous. The plaintiff alleges further that he is entitled to receive disability insurance benefits and supplemental security income benefits by virtue of a back injury that he sustained in the course of his employment in 1976.

**B.      The Administrative Record**

**1.      The Plaintiff's Background and Testimony**

The plaintiff was born on December 25, 1944, so that he was thirty-two years old at the time of his first application on May 4, 1976 and sixty years old at the time of

ALJ Bassett's final determination following remand.  Tr. 282.  The plaintiff testified

that he is not married and has no children.  Tr. 283.

The plaintiff lived with his parents and was supported financially by his father

until the time of his father's death in 1983.  Tr. 293.  The plaintiff graduated high

school and completed one year of college.  Tr. 283.  From 1968 to 1976 the plaintiff

worked as a manger of the dairy department of a supermarket.  The plaintiff's work at

the supermarket involved mostly standing and walking, and required the plaintiff to

lift and carry up to fifty or one hundred pounds.  Tr. 284.

The plaintiff claims to have suffered from a number of injuries in the

workplace.  He testified that he injured his neck in 1964 and his back in 1971.

Additionally, the plaintiff asserted that his most serious work related injury occurred

in 1976 when he was unloading a truck and the cargo bay doors where he was working

malfunctioned.  The doors fell on the plaintiff's back and head.  Tr. 285-86.  The

plaintiff stated that the 1976 accident resulted in severe pain which required him to sit

or lie down frequently.  Tr. 14.  As a result of this injury, the plaintiff claimed that he

was disabled and consequently has not worked after that incident.  Tr. 12, Tr. 285.

The plaintiff testified that he was treated for his pain, mostly by chiropractors, but

never had any back, shoulder, or neck surgery.  Tr. 288.  He did receive Workers'

Compensation benefits.  Tr. 313.

The plaintiff testified that he never returned to work or even tried to work again after the 1976 accident involving the bay doors falling on him. Tr. 313. He claims that he was unable to work because no job would provide him with the opportunity to sit and lie down as was needed to relieve his pain. Tr. 297. The plaintiff also testified that the chiropractic treatments helped him somewhat in terms of turning his head and lifting his arms, but that he could only walk one block, sit for fifteen to twenty minutes and stand or walk for ten to fifteen minutes at a time. Tr. 320-21. The plaintiff could not perform any sort of lifting. Tr. 321.

The plaintiff testified further that his pain and conditions got worse over the years. Specifically, the plaintiff complained of increasing pain in his neck, shoulders, head, middle and lower back, and knees. Tr. 287, Tr. 290, Tr. 294. He continued to see different chiropractors and specialists "through the 90s." Tr. 294. In addition, the plaintiff underwent knee surgery on October 10, 1988 to repair a torn medical meniscus, femoral chondromalacia, and patellar chondromalacia of the left knee; injuries he apparently suffered in an auto accident. Tr. 12, Tr. 75, Tr. 313.

### 2. The Plaintiff's Treatment History

### a. Dr. Charles Dennis

The plaintiff testified that Dr. Charles Dennis, a chiropractor, treated him from 1978 to 1986. Tr. 315-16. Dr. Dennis is deceased and his records were destroyed either by fire or a flood. Tr. 315. On January 8, 2002, Laura Dennis provided a letter

stating that the plaintiff was a patient of Dr. Dennis and "received a minimum of 200 treatments during [the period of 1978-1986]." Tr. 272. Laura Dennis is the wife of Dr. Dennis, and also was employed as his receptionist. Tr. 315. The plaintiff claims that Dr. Dennis treated him over six hundred times between 1978 and 1986. Tr. 316. There are no medical records from Dr. Dennis.

### b. Dr. Victor Gold

The plaintiff also testified that Dr. Victor Gold, an orthopedist, treated him approximately twelve times during the period of 1976 to 1981. Tr. 323. The plaintiff claims to see Dr. Gold occasionally to the present date. Tr. 323. However, Dr. Gold's records during the time period relevant to this case have apparently also been destroyed in a flood. Tr. 264.

On September 30, 1997, Dr. Gold filed a report on the plaintiffs' behalf with the Workers' Compensation Board. Tr. 266-67. Dr. Gold indicates that the plaintiff suffered an injury on April 2, 1971, when he was struck on the head by a door that malfunctioned, leaving him totally disabled. Tr. 267-67. Dr. Gold's report states that it is based on his examination of the plaintiff on September 26, 1997, and that this examination was his first treatment of the plaintiff. Tr. 266-67. This inconsistency with the plaintiff's testimony that Dr. Gold treated him approximately twelve times between 1976 and 1981 is not explained.

### c. Dr. Maurice Levy-Bencheton

On August 4, 1979, Dr. Levy-Bencheton of New York Diagnostic Center performed a consultative examination of the plaintiff. Tr. 155. It is not clear who the consultation was performed on behalf of, but considering the date of the examination and Dr. Levy-Bencheton's reference to a chiropractor, the consultation was likely on behalf of Dr. Dennis. According to Dr. Levy- Bencheton's record, Levakos reported that he developed neck pain in 1964 as a result of lifting "heavy cartons" at work. Dr. Levy-Bencheton reports that the plaintiff saw a chiropractor and the pain dissipated. However, the plaintiff started to suffer pain in the cervical region after becoming "manager of a supermarket where he had to carry, push and pull, and lift."

Dr. Levy-Bencheton examined the plaintiff and noted that he"[did] not have any other pain in any other joints, and does not have any impairment in ambulation. Sitting, standing walking is not impaired. Grasping and manipulating are 100% good." Tr. 155. X-rays of the plaintiff's thoracic spine were negative. Tr. 156. X-rays of the plaintiff's lumbosacral spine revealed spondylolsis at L5 bilaterally, with Grade I spondylolisthesis of L5 on S1. Tr. 156. Dr. Levy-Bencheton's final impression was that the plaintiff suffered "tenderness in the cervical region with maybe arthritis with need of X-ray evidence of arthritis of the cervical spine." Tr. 156.

### d.    Dr. Harvey Manes

On October 10, 1988, Dr. Harvey Manes performed arthroscopic surgery on the plaintiff's knee.  This included an arthotormy, a shaving of the medical meniscus, and a shaving of the femoral condyle and the patellar condyle.  Tr. 12, Tr. 75. Although it is not entirely clear from the administrative record, it appears that this surgery was performed to repair injuries sustained in a automobile accident.  Tr. 313.

On January 13, 1995, Dr. Manes conducted a consultative examination of the plaintiff for the New York State Department of Social Services.  Tr. 73.  Dr. Manes reported that the plaintiff complained of long history of neck and back pain, which continued to bother him.  The plaintiff also reported pain when he sat or stood for long periods of time and after strenuous activity.

On physical examination, Dr. Manes indicated that the plaintiff was "a well-developed, well-nourished male in no acute distress.  He gets on and off the examination table without any difficulty."  Tr. 73.  Dr. Manes also indicated that the plaintiff suffered tenderness of the paracervical muscles and a limited range of motion of the cervical spine.  Tr. 74.  Dr. Manes concluded that the plaintiff suffered cervical and lumbar arthritis, which left him mild-to-moderately disabled.  Tr. 74.  Dr. Manes did not describe any functional limitations.

### e.    Dr. Sebastian Caliendo

Dr. Sebastian Caliendo apparently treated the plaintiff from August 27, 1990 to

September 17, 1990, and again on March 28, 1991.  Tr. 273.  The only evidence that

Dr. Caliendo treated the plaintiff is a letter from him dated August 23, 2004.  The

letter consists of one paragraph, providing that "[Levakos] was treated in my office

from August 27, 1990 through September 17, 1990, and then again on March 28,

1991.  At that [sic] he was totally disabled and unable to perform his normal work

duties.  Copy of treatment dates attached."  Tr. 273.  No medical records of Dr.

Caliendo's treatment of the plaintiff are provided.

### f.     Dr. Christos Vasakiris

On May 25, 1994, Dr. Christos Vasakiris, a chiropractor, began treating the

plaintiff.  Tr. 227.  The plaintiff's treatments by Dr. Vasakiris between May 25, 1994

and December 21, 1998 are well-documented in the form of a chart indicating the date

of the visit, the procedure undertaken, and the doctor's findings.  Tr. 205-30.

On May 25, 1994, X-rays of the plaintiff's cervical spine revealed a moderate

to severe discogenic spondylosis at the C5/C6 and C7 vertebral levels; moderate

uncinate osteophytic hypertrophy at the C5/C6 and C7 verterbral levels; and total loss

of the cervical lordosis.  Tr. 64.  X-rays of the lumber spine revealed L5 spondylolsis

accompanied by grade 2 spondylolisthesis of L5 upon S1; anterior discogenic

spondylosis with osteophytic development between L5/S1; S1 spina bifida occulta;

and mild to moderate posterior joint artherosis between the L5/S1 vertebral segments.

Tr. 65. Dr. Vasakiris began treating the plaintiff with cervical traction, spinal manipulation, ultra sound, and stretch and spray-flexion-distraction. Tr. 63.

On June 3, 1994, Dr. Vasakiris submitted a report to the Workers' Compensation Board indicating that, in his opinion, the plaintiff was totally disabled. Tr. 63. On July 6, 1994, Dr. Vasakiris wrote a letter to the County of Suffolk Commissioner of Jurors, requesting that the plaintiff be relieved of his jury duty. Tr. 79. Dr. Vasakiris stated that the plaintiff suffered from a "lumber spine condition which is permanent and results in exacerbation upon prolonged periods of sitting."

On December 5, 1994 Dr. Vasakiris provided an in-depth report of the plaintiff's residual functional capacity to the New York State Department of Social Services. Tr. 66-72. Dr. Vasakiris noted that he had first seen the plaintiff on May 25, 1994, and that he had treated him two to three times weekly.

Dr. Vasakiris opined that the plaintiff had cervical spondylosis, ankylosing hyperostosis, degeneration of two cervical discs, spondylolisthesis, acquired kyphosis, and disturbance of skin sensation. Tr. 66. In conjunction with these findings, Dr. Vasakiris assessed that the plaintiff had limited mobility; could lift/carry two to three pounds and on occasion a maximum of twenty pounds; and could stand and walk for less than two hours and sit for less than six hours in an eight-hour workday. Tr. 66-72. In addition, Dr. Vasakiris stated his opinion that the plaintiff could not push or pull more than two to five pounds for more than two hours. Dr. Vasakiris believed

that the plaintiff should avoid "prolonged activity in the flexed or seated position." Tr. 72.

On March 20, 1995, Dr. Vasakiris examined the plaintiff and memorialized his impression in a report. Dr. Vasakiris indicated in his report that considering the plaintiff's history and objective examination findings further diagnostic testing through "EMG/NCV procedures" was necessary, and that the following differential diagnosis must be considered: herniated intervertebral disc; spinal nerve root encroachment/stenosis; peripheral neuropathy; peripheral nerve entrapment; and post-traumatic nerve trauma. Tr. 194.

On June 16, 1995 Dr. Vasakiris provided another report indicating the plaintiff's residual functional capacity. Tr. 76. According to Dr. Vasakiris' observations, the plaintiff was unable to sit for more than one hour or to stand for more than two to three hours in an eight hour work day. The plaintiff was able to lift only up to five pounds "frequently"; five to twenty pounds "occasionally"; and never more than twenty pounds. The plaintiff was reported as never being able to carry more than twenty pounds. Limitations were also indicated in respect to bending, pushing, and pulling objects. Tr. 76. Dr. Vasakiris continued to treat the plaintiff through December 1998.

### g. Dr. Stephen Hershowitz

Dr. Stephen Hershowitz is a neuro-radiologist. On May 2, 1995, Dr. Hershowitz performed an MRI on the plaintiff's lumbar spine. Tr. 78. Dr. Hershowitz indicated that the plaintiff suffered from a severe narrowing of the L5/S1 neural foramina bilaterally and of the L5/S1 disc. Dr. Hershowitz's impression was that the plaintiff suffered from a Grade II spondylolisthesis involving L5 on S1 and a small L5/S1 disc bulge.

### h. Dr. Richard J. Tabershaw

Dr. Richard J. Tabershaw, an orthopedist, began treating the plaintiff on May 3, 1995 following a referral of the plaintiff from Dr. Vasakiris. In a report dated May 3, 1995, Dr. Tabershaw indicated that the plaintiff was referred to him for "evaluation of primarily neck and severe low back pain that he has had since he injured himself at work in 1971. [The plaintiff] has been disabled and not working since 1976 because of the severe chronic neck and low back pain." Tr. 83. Dr. Tabershaw notes that chiropractic treatment has allowed the plaintiff to continue functioning.

Upon examination Dr. Tabershaw concluded that the plaintiff had spondylolisthesis at LS-S1. Dr. Tabershaw advised that the plaintiff should continue with chiropractic treatments and proscribed "Tylenol #3" and "Motrin, 800 mgs." for the pain.

On May 4, 1995, Dr. Tabershaw reported to the Workers' Compensation Board that the plaintiff was totally disabled. Tr. 178.

On June 2, 1995, a Dr. Edward Perkes conducted an MRI of the plaintiff at the request of Dr. Tabershaw. Tr. 81. In a letter to Dr. Tabershaw, Dr. Perkes reported that the MRI revealed prominent right paracentral/posterolateral C3-C4 disc herniation; a herniated disc at C4-5; a broad herniation at C5-6; a large herniated disc at C6-7 with cord impingement; and a narrowing of the C5-6 and C6-7 intervertebral disc spaces with anterior osteophype formation. Tr. 82.

On June 21, 1995 Dr. Tabershaw opined that the plaintiff did not need surgery and suggested that chiropractic care with intermittent medical treatment in the form of anti-inflammatories and analgesics would be sufficient treatment. Tr. 80.

Dr. Tabershaw reported to the Workers' Compensation Board again on June 22, 1995 and November 28, 1995. In each report, Dr. Tabershaw reported that the plaintiff was totally disabled. Tr. 171-72.

On March 9, 1996 Levakos reportedly fell and sprained his ankle. Tr. 13. Dr. Tabershaw's examination revealed pain over the ATR ligaments, deltoid ligament pain, and a positive anterior drawer sign. The plaintiff's initial diagnosis of a sprained ankle was confirmed in an April 1996 follow up examination. Tr. 13. Consequently, Dr. Tabershaw filed a report with the Workers' Compensation Board which indicated that the plaintiff was partially disabled due to cervicalgia. Tr. 172.

### i. Dr. Seymour Einhorn

On April 8, 1996, Dr. Seymour Einhorn, an orthopedist, examined the plaintiff. Tr. 158. In his review of the plaintiff's medical history, Dr. Einhorn notes that the plaintiff injured his neck in 1965 "lifting up heavy crates"; that the plaintiff "had recurrence of pain in 1978." Tr. 158. Dr. Einhorn indicated that the plaintiff walked with a cane. A physical examination of the plaintiff revealed that he was unable to walk on his heels and toes. Dr. Einhorn noted that the plaintiff experienced a restricted range of motion in his back, as well as cervical spine pain with right oblique extension radiating to the left shoulder and down into the left hand. Dr. Einhorn also noted that the plaintiff's straight leg raising and sciatic nerve tension tests were positive. Tr. 13. Dr. Einhorn indicated that the plaintiff was unable to do any bending or lifting and was limited to sitting for short periods of time. Tr. 14. Dr. Einhorn determined that the plaintiff was markedly physically disabled and unemployable. Tr. 161.

The Court also notes that, In his motion papers, the plaintiff states that Dr. Einhorn treated him in the "70s, 80s, and 90s" but that Dr. Einhorn "can't find" the records.

### j. Dr. Magdy S. Shady

On January 30, 1998, Dr. Magdy Shady, a neurosurgeon, examined the plaintiff. Tr. 186. Dr. Shady concluded that the plaintiff had a left C7 radiculopathy

due to spondylosis of the cervical spine mainly at C6-C7.  Tr. 186.  Dr. Shady noted that the plaintiff traveled to her office himself, was not in acute distress, and that the range of motion of his neck was ninety percent normal.  Dr. Shady recommended a C6-C7 microdiscectomy and anterior interbody fusion.  Tr. 187.

### k.        Dr. Rashed Ayyub

On February 20, 2001, Dr. Rashed Ayyub, an orthopedist, examined the plaintiff on behalf of the Commission.  Tr. 231.  Dr. Ayyub concluded that the plaintiff suffered from (1) post concussion syndrome; (2) herniated intervertebral disc of the cervical spine; (3) bilaterial brachial plexus neuralgia; (4) herniated intervertebral disc of the thoracic spine; (5) herniated intervertebral disc of the lumbosacral spine; (6) bilateral sciatica; (7) ligamentous and cartilaginous injury in the left knee; (8) post traumatic arthritis in the left knee; (9) diabetes mellitus; (10) recurrent renal colic on the right side; and (11) melanoma on the back.  Tr. 233.  Dr. Ayyub's suggested in his prognosis that "on a long term basis" he expected the plaintiff's "signs and symptoms to be persistent, chronic, and recurrent in nature."  Dr. Ayyub also noted that the plaintiff suffered from a "severe impairment in standing continuously [sic] at the most for a few minutes with frequent rests in between.  He can hardly walk a few blocks [sic] at the most with frequent rests in between with the help of his cane and has severe impairment in lifting more than a few pounds at present at the same time."  Tr. 231-33.

### C.    The ALJ's Decision

The ALJ partially denied the plaintiff's claim. Tr. 16-17. On June 25, 2004, ALJ Bassett issued a written decision stating his conclusion that, based upon all the evidence of record, the plaintiff was not "disabled" as defined by the Act prior to May 25, 1994. Thus, it was the decision of the ALJ that the plaintiff failed to establish that he was disabled prior to the date when he qualified for disability insurance benefits under the Act, but that the plaintiff was entitled to supplemental security income under Section 1602 of the Act based on his disability from May 25, 1994. Tr. 17. The plaintiff appeals from ALJ Bassett's determination that he was not disabled prior to May 25, 1994.

## II.    DISCUSSION

### A.    The Legal Standard

In its review of the Commissioner's decision, the Court must determine whether (1) the Commissioner applied the correct legal standard, see Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); and (2) the decision is supported by substantial evidence, see 42 U.S.C. § 405(g); Brown v. Apfel, 174 F.3d 59, 61-62 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." Brown, 174 F.3d at 62-63.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn."  Brown, 174 F.3d at 62 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  In evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review.' "  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

Remand of a disability claim for further administrative procedures is an appropriate remedy where, among other matters, (1) "there are gaps in the administrative record or the ALJ has applied an improper legal standard," Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); or (2) new, material evidence is adduced that was not produced before the agency.  See Raitport v. Callahan, 183 F.3d 101, 104 (2d Cir. 1999) (citation omitted).

**B.**     **Availability of Benefits**

Federal disability insurance benefits are available to those individuals who are "under a disability," as defined by the Act, prior to the time he or she last met the

insured status requirements of 42 U.S.C. § 423(c). <u>See</u> 42 U.S.C. §§ 423(a)-(d). Supplemental security income benefits are available to every person who is aged, blind, or disabled as defined by 42 U.S.C. § 1382c, and who also are eligible on the basis of income and resources as specified in the Act. 42 U.S.C. § 1381a.

A plaintiff is "disabled" under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d), 1382c(a)(3); <u>see also</u> <u>Barnhart v. Walton</u>, 535 U.S. 212, 221, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002) (The term "disability" has the same meaning when used in different parts of the same Act.). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Federal regulations set forth a five-step analysis that the Commissioner must follow in evaluating disability claims:

1. The ALJ must consider whether the claimant is currently engaged in substantial gainful activity.

2. If not, the ALJ must consider whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the ALJ must ask whether, based solely on medical evidence, that limitation is listed in Appendix 1 of the regulations.

4. If the impairment is not "listed" in the regulations, the ALJ then asks whether she has residual functional capacity to perform her past work despite her severe impairment.

5. If she is unable to perform her past work, the burden shifts to the ALJ to prove that the claimant retains the residual functional capacity to perform alternative work.

20 C.F.R. §§ 404.1520, 416.920; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002)).  The claimant bears the burden of proof as to the first four steps, while the ALJ bears the burden of proof as to the fifth step. See Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In proceeding through the five-step analysis, the Commissioner must consider four factors:  "(1) objective medical facts; (2) diagnosis or medical opinions based on these facts; (3) subjective evidence of pain and disability; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

### C.    Analysis

#### 1.    The ALJ Applied the Correct Legal Standard

ALJ Bassett adhered to the appropriate five-step analysis.  At step one, the ALJ found that the plaintiff had not engaged in gainful activity since December 20, 1976.  Tr. 12.  At step two the ALJ found that the medical evidence established that prior to

May 25, 1994, the plaintiff had no medically determinable impairments that lasted or could be expected to last for at least twelve months and which significantly limited his ability to engage in substantial gainful activity. Tr. 14. Also at step two, the ALJ further found that after May 25, 1994 the plaintiff was severely impaired by spondylolisthesis and spondylosis of L5-S1, degenerative disc disease of the cervical and lumbar spines, and herniated discs from C3 to C7 with radiculopathy." Tr. 15. At step three, the ALJ found that none of the plaintiff's impairments, alone or in combination, meet or equal the medical criteria for any impairments listed in 20 C.F.R. Pt. 404, Subpt P., App. 1. At steps four and five, the ALJ found that since May 25, 1994, pain and resultant limitations have reduced the plaintiff's residual functional capacity to an ability to perform less than a full range of sedentary work, and that he has been precluded from performing his past relevant work or any other work existing in significant numbers in the national economy. Tr. 15. Based on these findings, the ALJ concluded that the claimant has been disabled since May 25, 1994, but not prior to that date.

### 2. The ALJ's Decision is Supported by Substantial Evidence

The only aspect of the decision of the ALJ that the plaintiff challenges is the determination of the plaintiff's disability onset date. The plaintiff claims that he has been disabled since 1976. The ALJ found that the plaintiff has been disabled

beginning May 25, 1994, but not prior to that date. The record supports this determination.

There is little evidence of the plaintiff's medical history prior to 1994. The plaintiff testified that he was treated by Dr. Dennis, a chiropractor, and Dr. Gold, an orthopedist, between 1978 and 1986, but that the records of both doctors have been destroyed. Consequently, no records from either doctor were produced.

There is evidence that the plaintiff was treated by Dr. Levy-Bencheton in 1979. Dr. Levy-Bencheton reported that the plaintiff "does not have any impairment in ambulation. Sitting, standing walking is not impaired. Grasping and manipulating are 100% good." Tr. 155. On October 19, 1981, the Workers' Compensation Board found that the plaintiff was permanently, partially disabled. Tr. 263. The next available evidence of any treatment of the plaintiff from approximately seven years later, in 1988, when the plaintiff's knee was operated on by Dr. Manes.

Finally, the plaintiff produced a one paragraph letter from Dr. Caliendo stating that "[Levakos] was treated in my office from August 27, 1990 through September 17, 1990, and then again on March 28, 1991. At that [sic] he was totally disabled and unable to perform his normal work duties. Copy of treatment dates attached." Tr. 273. No medical records of Dr. Caliendo's treatment of the plaintiff are provided.

Taken as a whole, the record lacks evidence to support the plaintiff's claim that he was disabled within the terms of the statutes and regulations prior to May 25, 1994.

Thus, the Court finds that the record supports the Commissioner's conclusion that the plaintiff failed to meet his burden of establishing that he was disabled while he was still insured. The ALJ reasonably concluded that the plaintiff did not receive any regular form of medical or chiropractic treatment from December 20, 1976 to May 25, 1994, and that "it [was] reasonable to assume that if the claimant was experiencing the degree of pain and functional limitation that he has alleged that he would have sought and received medical treatment." Tr. 14. As ALJ Bassett noted, "the first evidence of functional limitations relating to the claimant's neck and back conditions is when he began chiropractic treatment in May 1995."

In sum, the Court finds that the ALJ applied the correct legal standard and that there is substantial evidence supporting the determination that the plaintiff was disabled from May 25, 1994, but not prior to that date. Accordingly, the plaintiff's motion for judgment on the pleadings is denied, and the defendant's motion for judgment on the pleadings is granted.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the Commissioner's motion pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings is **GRANTED**, and it is further

**ORDERED**, that the plaintiff's motion for judgment on the pleadings is **DENIED**; and it is further

**ORDERED**, that the final decision of the Commissioner is affirmed; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
       August 7, 2006

                        */s/ Arthur D. Spatt*
                         ARTHUR D. SPATT
                United States District Judge